1030-20372 #1462926

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **TERRY DURR** <br> **Plaintiff** | **CIVIL ACTION NO: 2:18-CV-3742** |
| **VERSUS** | **DISTRICT JUDGE:** <br> **HON. BARRY W ASHE** |
| **GOL, LLC and** <br> **REC MARINE LOGISTICS, LLC,** <br> **Defendants** | **MAGISTRATE JUDGE:** <br> **HON. JANIS VAN MEERVELD** |

### MEMORANDUM IN SUPPORT OF MOTION IN LIMINE TO EXCLUDE TESTIMONY AND EXPERT REPORT OF CAPTAIN GREGORY C. DALEY

**MAY IT PLEASE THE COURT:**

Defendants, GOL, LLC and REC Marine Logistics, LLC (collectively, "REC/GOL"), respectfully request that this Honorable Court grant their motion in limine, striking portions of Gregory C. Daley's ("Daley") expert report and precluding testimony regarding weather and sea conditions on the date of the accident. REC/GOL further requests that the Court exclude certain opinions and testimony by Daley on the grounds that such opinions and testimony are based on inaccurate and unsupported factual assumptions and constitute impermissible legal conclusions.

### FACTUAL BACKGROUND

Plaintiff, Terry Durr ("Durr"), claims he was injured during a personnel basket transfer on December 17, 2017.[1] The basket transfer sought to move Durr from the M/V HANNAH C, an offshore supply vessel owned and operated by REC Marine Logistics, to the VR315-A, a fixed platform located in the Vermilion Field, operated by Fieldwood Energy.[2] Captain Michael

---

[1] *See* Rec Doc 1, ¶V.
[2] Rec Doc. 1, ¶¶ IV-V. *See also* Rec Doc. 81, ¶X.

Crowder was captain of the M/V HANNAH C on the date of the accident.[3] The crane on the VR315-A was operated by Michael Broussard, an employee of Wood Group PSN.[4] Durr was employed by Linear Controls, Inc. as a mechanic.[5]

### 1. The Accident

Around 2:00 p.m. on the afternoon of December 17, 2017, Durr was being transported from Platform VR313 to Platform VR315-A on the M/V HANNAH C.[6] Once the M/V HANNAH C arrived at VR315-A, it moved into position to initiate the basket transfer with the stern of the vessel parallel to the platform, in front of the crane.[7] Broussard placed the personnel basket, a collapsible "Billy Pugh" basket, on the deck of the M/V HANNAH C, and Durr climbed onto the basket.[8] At Broussard's deposition, he testified that he observed the M/V HANNAH C drift toward the platform over the course of "one to two minutes."[9] After Durr climbed onto the personnel basket, Broussard observed the M/V HANNAH C dip down, due to a swell.[10] Despite observing that the boom of the crane was not centered over the personnel basket, Broussard went "wide open" with the crane's fast line, lifting the personnel basket in a rapid manner.[11] The personnel basket then swung toward cargo that had been chained down on the deck of the M/V HANNAH C, with Durr allegedly striking a chain used to secure the cargo.[12] Broussard readily admitted that initiating the lift when the boom was not centered was against

---

[3] A true and correct copy of portions of the deposition of Captain Michael Crowder is attached as Exhibit 1. *See* Exhibit 1, p. 11:6-7.
[4] A true and correct copy of portions of the deposition transcript of Michael Broussard is attached as Exhibit 2. *See* Exhibit 2, 11:14-17; 16:13-16.
[5] A true and correct copy of portions of the deposition transcript of Terry Durr is attached as Exhibit 3. *See* Exhibit 3, 15:24-16:1; 16:22-17-1.
[6] Rec Doc 1, ¶¶ IV-V.
[7] Exhibit 1, 32:17-24.
[8] Exhibit 2, 54:18-55:2; 57:17-21.
[9] *Id* at 119:10-21.
[10] *Id* at 57:22-25.
[11] *Id* at 59:22-60:15; 145:18-25.
[12] *Id* at 145:3-17.

what he understood to be safe practices in crane operation and may have contributed to the basket's swinging.[13]

Captain Crowder disputes Broussard's testimony regarding the movement of the M/V HANNAH C, testifying that he manually held the M/V HANNAH C steady during the personnel basket transfer and that the M/V HANNAH C did not drift toward the platform at any time during the transfer.[14]

At the time of the accident, the M/V HANNAH C had been outfitted with a dynamic positioning ("DP") system.[15] However, the DP system aboard the M/V HANNAH was not functioning at the time of the accident.[16] Consequently, Captain Crowder's station keeping of the M/V HANNAH C was undertaken manually during the personnel basket transfer at issue. In Captain Crowder's experience, the DP system required rougher weather conditions than those present on the date of the accident, and, as such, Captain Crowder would not have used the DP system to hold the vessel steady on the date of the accident, even if it had been operational.[17] Further, Blaine Russell, REC's Director of Operations, testified that the use of DP during a personnel basket transfer is at the captain's discretion.[18] There is no evidence in the record that shows that the M/V HANNAH C was required to have an operational DP system on the date of Durr's accident, that DP is required to be used during personnel basket transfers, or that, as a matter of custom and practice in the industry, DP systems are standard on offshore supply vessels or customarily employed during basket transfers.

---

[13] *Id* at 108:3-18; 120:12-17.
[14] Exhibit 1, 78:9-79:4; 117:4-11; 246:14 – 247:1; 249:8-19.
[15] *Id* at 167:23-24.
[16] *Id* at 167:25-168:2-3; 170:14-22.
[17] *Id* at 167:1-4; 168:18-169:7; 232:14-233:3; 261:8-24.
[18] A true and correct copy of portions of the Deposition of Blaine Russell is attached as Exhibit 4. *See* Exhibit 4, 75:18-76:6.

2. **Daley's Opinions**

   a. **Weather and Sea Conditions**

Durr retained Daley in this matter to render opinions regarding the personnel basket transfer and the operations of the M/V HANNAH C. Daley offers opinions regarding a number of issues, using his experience as a vessel master on "oilfield supply vessels" in the Gulf of Mexico and elsewhere as the foundation of his expertise, as well as his "in depth experience" operating offshore cranes, including offloading personnel baskets.[19] Daley does not list any background in meteorology or oceanography in his expert report, as he appears to have no qualifications in these fields and has undergone no training and/or certification pertaining to meteorological analysis.

Notwithstanding his lack of expertise in meteorology or oceanography, Daley offers a meteorological/oceanographic opinion in this case, opining that "there were many different waves of varying heights that affected the MV Hannah C" and that the average of the 1/3 largest of those waves was five feet, while "ten percent of those waves were greater than 6.4 feet" and "one percent of those was were greater than 8 feet."[20] He further notes that the largest wave expected was ten feet. Daley arrives at these conclusions from purportedly analyzing NOAA Wind and Wave Charts.[21] He also offers an analysis regarding surface conditions at the VR315-A, stating that a "series of lows" over the Northern Gulf created a "stationary front" due to cold and warm air masses pushing against each other.[22] Daley also opined that an "outflow boundary" was present in the Northern Gulf near the VR315-A, accompanied by a wind shift and drop in

---

[19] A true and correct copy of the Expert Report of Captain Gregory C. Daley is attached as Exhibit 5. *See* Exhibit 5, p. 69-70.
[20] *See* Exhibit 5, p. 28.
[21] *Id* at p. 28.
[22] *Id* at p. 36.

temperature.[23] Despite offering the above opinions, Daley then deferred to Durr's expert in meteorology, Dr. Marshall Earle ("Dr. Earle"), stating "his results are similar to mine," despite the fact that Daley's calculations, in fact, suggest rougher sea conditions than the calculations offered by Dr. Earle.[24]

### b. Inadequate Station Keeping

Daley's report concludes that the M/V HANNAH C made a ten (10) foot aft movement during the personnel basket transfer, and, if Captain Crowder had been able to keep the vessel steady, Durr's accident would not have occurred.[25] In support of this opinion, Daley relies upon purported facts that are either not established in the record or are directly in dispute. Specifically, Daley states that there was a ten (10) feet excursion aft of the M/V HANNAH C which caused the accident.[26]

Daley's opinion regarding station keeping fails to cite to evidence in the record indicating that the M/V HANNAH C moved ten feet during the transfer. Nevertheless, the movement of the M/V HANNAH C is disputed by Captain Crowder, who testified that the M/V HANNAH C did not move or drift during the transfer.[27] Notably, there is no external data or evidence, such as video or navigational data, to suggest that the M/V HANNAH C drifted ten feet aft as suggested by Daley.

Daley's report also includes a diagram that purports to illustrate the effect of waves, wind, and current on the M/V HANNAH C, suggesting that waves pushing against the vessel's port bow and wind/current pushing against the vessel's starboard stern shifted the M/V

---

[23] *Id*.
[24] *Id* at p. 37.
[25] *Id* at pp. 48, 51.
[26] *Id* at p. 51.
[27] *See* Exhibit 1, 78:9-79:4; 117:4-11; 246:14 – 247:1; 249:8-19.

5


HANNAH C starboard.[28] Daley does not provide any indication as to the source of the information illustrated in the diagram. However, to the extent that Daley created the diagram based on the testimony of Captain Crowder regarding conditions on the date of the accident, Captain Crowder refused to testify with specificity regarding the sea/weather conditions, stating only that such conditions were a "possibility."[29] Moreover, the diagram, which Daley relies on to state that the combination of forces against the port bow and starboard stern forced the M/V HANNAH C starboard, does not accurately reflect Captain Crowders equivocal testimony, which suggested that the wind, current, and seas were a single directional force, pushing into the vessel's starboard stern.[30]

### c. Use of Dynamic Positioning System

Daley also concluded that the DP system installed aboard the M/V HANNAH C would have "held position [of the M/V HANNAH C] safely" and, if the DP system had been functioning on the date of the accident, the accident would not have occurred.[31]

In support of this opinion, Daley stated that DP systems are installed on vessels to "control the yaw, surge, and sway of a vessel."[32] Daley further cites to weekly systems checklists for the M/V HANNAH C that indicate the DP system had not been working for approximately a year prior to the accident.[33] He then addresses repair records from Kongsberg Maritime, which repaired the DP system after the accident in suit, suggesting that the repairs were "straightforward," despite the fact that Kongsberg had been called out to the vessel to address

---

[28] Exhibit 5 at p. 51.
[29] Exhibit 1, 165:1-166:22.
[30] *Id.*
[31] Exhibit 5 at p. 52.
[32] *Id* at p. 58.
[33] *Id* at p. 53.

various issues causing the DP to malfunction on at least eleven separate occasions to address malfunctions since the DP system was installed on the vessel in late 2013.[34]

Notably absent from Daley's report is any discussion regarding the use of DP versus manual station keeping of the vessel, and no evidence is cited by Daley to suggest that use of the DP in the circumstances present during the personnel basket transfer would have been "safer", other than a blanket, unsupported statement that the vessel would not have moved more than "three feet" with the DP system engaged.[35] Daley similarly does not address testimony from Captain Crowder that the relatively calm weather conditions on the date of the accident were not sufficient for the DP system to engage properly. Moreover, in concluding that the use of the DP would have been "safer" than manual station keeping, Daley cites to no industry standard regarding use of DP, nor any regulatory scheme addressing or applying to the use of DP on offshore supply vessels. Notably, Daley cites to no evidence that manual station keeping is not an accepted practice during personnel basket transfers. Instead, Daley simply concludes that the DP system would have been "safer," and that if the DP system had been used during the transfer, the accident would not have occurred.[36] At no point in his report does Daley address Broussard's operation of the crane or his testimony suggesting that his failure to center the boom over the basket may have caused the basket to swing forward.

---

[34] *Id* at p. 54-56. Moreover, Daley conveniently only references the Kongsberg repair records that illustrate REC/GOL's efforts to repair the DP system after Durr's accident. Attached as Exhibit 6 is a true and correct copy of Kongsberg's response to a Subpoena Duces Tecum issued by REC/GOL requesting all repair Kongsberg repair records relative to the M/V HANNAH C. These records show that, over the course of four years, the M/V HANNAH C experienced numerous DP malfunctions which Kongsberg mechanics were called to address eleven times. In calling the repairs to the M/V HANNAH C's DP system "straightforward" belies evidence in the record that suggests the vessel was experiencing malfunctions on a sufficient basis to require numerous service calls.
[35] Exhibit 5 at p. 60.
[36] *Id*.

7

**LAW AND ARGUMENT**

1. **The *Daubert* Standard**

A district court has the discretion to admit or exclude expert evidence under the Federal Rules of Evidence. *Dukes v. Zafiro Marine*, 2018 WL 6600108 at*2 (E.D. La. 2018); *citing to General Elec. Co. v. Joiner*, 522 U.S. 136, 139 (1997). Moreover, the district court serves as the "gatekeeper" to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 589 (1993). *Daubert*, interpreting Federal Rule of Evidence 702, requires that a proffered expert's testimony be reliable, such that the testimony "reflects the scientific knowledge, is derived from the scientific method, and is supported by 'appropriate validation.'" *See Chandler v. R&B Falcon Inland, Inc.* 2001 WL 839019 at *4 (E.D.La. 2001), *citing Jacobs v. Northern King Shipping Co., Ltd.*, 1998 WL 28234 (E.D.La. 1998).

2. **Daley is not Qualified to Testify Regarding Meteorological Data and His Testimony Would be Cumulative of Durr's Proffered Expert Meteorologist, Dr. Marshall Earle**

Daley's qualifications do not permit him to offer testimony regarding the weather and sea conditions on the date of Durr's accident, especially as to wave height and distribution. A district court must be assured that the proffered expert is "qualified to testify by virtue of his 'knowledge, skill, experience, training or education,'" and it should refuse to allow an expert to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject. *Wilson v. Woods*, 163 F. 3d 935, 937 (5th Cir. 1999). Additionally, it is proper for a court to exclude expert testimony regarding meteorological facts when the purported expert has no qualifications to render such opinions. *Navarette v. General Ins. Co. of America*, 2009 WL 1636967 at *2 (E.D.La. 2009).

Daley is unqualified to testify regarding meteorological facts or to perform meteorological analyses of the weather and sea conditions on the date of Durr's accident. Daley has received no training or education in meteorological analysis, has articulated no experience in performing such analyses, has not provided the bases for his calculations of wave weight or distribution, and has not been tendered as an expert in meteorology or oceanography. Nevertheless, Daley offers opinions as to wave height and distribution.[37] Daley's report contains no articulation of how he reached his conclusions regarding wave height or distribution, and, as such, he has provided the Court with no indication that his calculations are reliable. Because of Daley's lack of expertise in meteorology/oceanography and his failure to provide the Court with the bases of his conclusions, Daley's opinions regarding weather and sea conditions on the date of the accident should be excluded and stricken under *Navarette* and *Daubert*.

Moreover, Daley's testimony would be cumulative of Durr's proffered expert meteorologist, Dr. Marshall Earle. Federal Rule of Evidence 403 permits a court to exclude evidence that is needlessly cumulative, replicating other admitted evidence. *See Lachute v. Ochsner Clinic Found.*, 2012 WL 5818149 at *1 (E.D. La. 2012). Expert reports that provide similar conclusions offered by the same party are indeed cumulative. *See id.* This Court is therefore permitted to exclude on the basis that Daley's opinions will be repetitious of evidence already introduced. *Henson v. Oddysea Vessels, Inc.*, 2008 WL 449726 at *1 (E.D. La. 2008); *citing Consolidated Grain & Barge Co. v. Marcona Conveyor Corp.*, 716 F. 2d 1077, 1083 (5th Cir. 1983).

Durr has proffered Dr. Marshall Earle as an expert in meteorology, and Dr. Earle has performed calculations regarding wave height and distribution that are purportedly based upon

---

[37] Exhibit 5, pp. 28 – 37.[37]

his education, training, and experience.[38] Daley, however, is proffered as an expert in vessel operations and crane operations.[39] His expertise and testimony should be limited to vessel operations and crane operations pertaining to personnel basket transfers. In fact. Daley's report indicated that he would defer to Dr. Earle's analyses, while nevertheless providing his own calculations regarding sea conditions. Specifically, Daley suggests that the largest expected wave to be encountered by the M/V HANNAH C was ten feet.[40] This is vastly different than the largest wave likely calculated by Dr. Earle, which was 7.1 feet.[41] In fact, each of Daley's "calculations" would suggest that sea conditions were, in fact, rougher, than those described in Dr. Earle's report.[42]

While Dr. Earle's and Daley's calculations are different, both purport to provide opinions as to wave height and sea conditions at the time of the personnel basket transfer. Durr is not entitled to present two experts to provide opinions regarding weather and sea conditions on the date of the accident, especially when only one expert appears to be qualified in the field. Accordingly, because Daley is not qualified to render an expert opinion regarding weather and sea conditions, and because his testimony would be cumulative of Dr. Earle's, his testimony should be excluded and the portions of Daley's report regarding weather should be stricken.

3. **Daley's Proffered Testimony is Based on Impermissible Factual Assumptions and/or Miscalculations and Constitutes Impermissible Legal Conclusions that Should Be Stricken and Excluded**

An expert's testimony "must be reliable at each and every step or else it is inadmissible." *Knight v. Kirby Inland Marine, Inc.*, 482 F. 3d 347, 354-55 (5th Cir. 2007). "Where an expert's

---

[38] A true and correct copy of the expert report of Dr. Marshall Earle is attached as Exhibit 7. *See* Exhibit 7, CV, pp. 1-21.
[39] Exhibit 5, pp. 69, CV attached to expert report as Exhibit A.
[40] Exhibit 5 at p. 28.
[41] Exhibit 7, pp. 7-8.
[42] Exhibit 5 at p. 28; Exhibit 7, p. 5-8.

opinion is based on insufficient information, the analysis is unreliable." *Seaman v. Seacor Marine, L.L.C.*, 326 Fed. Appx. 721, 725 (5th Cir. 2009) (Unpublished); *citing Paz v. Brush Engineered Materials, Inc.*, 555 F. 3d 383, 388). Moreover, opinion evidence based on incomplete factual assumptions is not reliable and should be stricken. *Munoz v. Orr*, 200 F.3d 291, 301 (5th Cir. 2000)(affirming lower court's exclusion of expert testimony where the expert failed to consider certain variables in his analysis and miscalculated the evidence.) An expert's opinion that further fails to control for other explanatory variables makes the opinion, "essentially worthless." *See id, citing to Tagatz v. Marquette Univ.*, 861 F.2d 1040, 1045 (7th Cir.1988)(expert opinion which failed to take into account other possible explanations for salary differences in discrimination suit was not reliable.)

Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 156 (1999). "Without more than just credentials and an unsupported opinion, an expert's testimony that 'it is so' is not admissible." *Viterbo v. Dow Chemical Co.*, 826 F. 2d 420, 424 (5th Cir. 1987). An expert is further precluded from making legal conclusions reserved for the court, crediting or discrediting witness testimony, or otherwise making factual determinations reserved for the trier of fact. *Dukes* at *3, *citing to Highland Capital Management, L.P., v. Bank of Am., N.A.*, 574 F. App'x 486, 491 (5th Cir. 2014)(excluding expert report that stated that actions of defendant caused plaintiff's injury and plaintiff was free of fault as legal conclusion/factual determination.)

    a. **Daley's Opinions Regarding Station Keeping Are Unreliable and Represent Impermissible Legal Conclusions**

Here, Daley's proffered conclusion that Captain Crowder failed to keep the vessel steady, causing the accident, is based on incomplete facts in the record such that his opinion represents an impermissible legal conclusion.

Daley bases his conclusion on his suggestion that the M/V HANNAH C drifted ten (10) feet aft prior to the lift. Daley presents this as an established fact, when, in reality, the alleged movement of the vessel is disputed by the testimony of Captain Crowder, who testified three separate times during his deposition that the seas were relatively calm on the date of the accident and the M/V HANNAH C did not drift in any direction prior to the transfer.[43] In concluding that the M/V HANNAH C moved and that such movement caused the accident, Daley simultaneously makes a factual determination left to the jury while offering a legal conclusion as to causation.

Moreover, despite articulating his credentials as an expert in crane operations, Daley's report does not address the actions of Broussard in "going wide open" and rapidly lifting the personnel basket, despite knowing that the boom of the crane was not centered over the basket, and despite acknowledging that lifting an uncentered load could cause the load to swing. In seeking to establish the movement of the vessel as "fact" and as the cause of the accident, without considering contradictory evidence or other explanatory variables, Daley's opinions are unreliable and should be stricken.

Further, in reference to Daley's opinion that the wind, waves, and current pushed the M/V HANNAH C starboard on the date of the accident, Daley's opinion is based on incomplete facts which render it unreliable. Daley does not articulate the source of the information depicted in his diagram at Figure 44, and, to the extent it is based on Captain Crowder's equivocal

---

[43] *See* Exhibit 1, 78:9-79:4; 117:4-11; 246:14 – 247:1; 249:8-19.

12

deposition testimony, it does not accurately reflect what Captain Crowder testified to.[44] Because Daley's opinion regarding the movement of the vessel starboard due to the wind, current, and waves is, at best, based on a miscalculation of Captain Crowder's testimony, and, at worst, based on no evidence in the record at all, it is unreliable and should be excluded and stricken from the Daley's proffered expert report.

      **b. <u>Daley's Opinions Regarding Use of the DP System are Unreliable and Represent Impermissible Legal Conclusions</u>**

Daley proffered the legal conclusion that the use of the DP system on the date of the accident would have been "safer" than manually operating the vessel, such that, if the DP system had been available and in use, the accident would not have happened. In concluding so, Daley offered no analysis regarding the use of the DP system versus manual station keeping. Instead, Daley states that the DP system would have constrained the vessel to moving only three feet, providing no basis for his determination that the DP would have been performed better than manual station keeping.

Additionally, Daley provided no discussion of data regarding reliability of DP systems versus manual control of the vessel. Daley failed to provide any basis for his statement that use of DP was appropriate in conditions on the date of the accident and provided no analysis regarding appropriate circumstances for use of DP systems versus manual control. He failed to provide any analysis regarding customary use of DP systems within the industry, and he could not cite to any industry standard, custom, rule, or regulation, that required that a DP system be available on the M/V HANNAH C or that the DP system be used during a personnel basket transfer. Consequently, Daley's conclusion that the DP system would have been "safer" is so

---

[44] Exhibit 5 at p. 51; Exhibit 1, 165:1-166:6.

simply because Daley says it is so. It is an impermissible legal conclusion, and it should be excluded.

## CONCLUSION

Captain Gregory C. Daley is not qualified to provide opinion testimony regarding weather or sea conditions on the date of the accident, as he has no training, education, or experience as a meteorologist or oceanographer. Further, his testimony on such subjects would be cumulative of Durr's proffered expert meteorologist, Dr. Marshall Earle. As such, any testimony of Daley regarding weather or sea conditions should be excluded and those portions of his expert report should be stricken. Daley's opinions that Captain Crowder's station keeping and lack of functional DP system on the M/V HANNAH C are based on incomplete factual assumptions which are to be determined by the jury and represent impermissible legal conclusions. Under the standard articulated in *Daubert*, Daley's opinions are not reliable and should be excluded and stricken from his expert report.

Respectfully submitted:

*/s/ Kristin K. Robbins*
Salvador J. Pusateri, T.A. (#21036)
Kristin K. Robbins (#31303)
Elizabeth B. McIntosh (#36575)
**PUSATERI, JOHNSTON, GUILLOT & GREENBAUM**
1100 Poydras Street, Suite 2250
New Orleans, Louisiana 70163
Telephone: (504) 620-2500
Facsimile: (504) 620-2510
Salvador.Pusateri@pjgglaw.com
Kristin.Robbins@pjgglaw.com
Elizabeth.McIntosh@pjgglaw.com
**ATTORNEYS FOR GOL, LLC and REC MARINE LOGISTICS, LLC**