UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| TERRY DURR | CIVIL ACTION NO.  18-CV-3742 M(1) |
| VERSUS | JUDGE BARRY W. ASHE |
| GOL, L.L.C., *et al* | MAG. JUDGE JANIS VAN MEERVELD |

### PLAINTIFF'S MEMORANDUM IN OPPOSITION TO REC/GOL'S MOTION *IN LIMINE* TO STRIKE AND/OR LIMIT THE TESTIMONY OF DR. TODD COWEN

Plaintiff Terry Durr, through undersigned counsel, respectfully submits this memorandum in opposition to the Motion *in Limine* to Strike and/or Limit the Testimony of Dr. Todd Cowen filed by Defendants GOL, LLC and REC Marine Logistics, LLC (collectively "REC/GOL") (Doc. 149).  As discussed below, REC/GOL relies on a single case out of this district (Judge Morgan's opinion in *Snider*) to assert that it is "well established" that a life care planner is allowed to give opinion testimony regarding a plaintiff's future medical needs *only* if those opinions are based on the testimony of a treating physician.  Respectfully, the *Snider* ruling is an outlier to the extent it requires that every item in a life care plan be prescribed by a treating physician, and industry standards and guidelines on life care planning disagree with that rule, especially as here, where the life care planner is a medical doctor and expert in his own right.[1]  Accordingly, the motion should be denied.

---

[1] Notably, the Defendants' joint expert in life care planning, Nancy Favaloro, who has issued a report and intends to offer expert opinions as to the estimated costs of Mr. Durr's future medical needs and care, did not rely on Mr. Durr's treating physicians *at all*.  Instead, she relied *solely* on a consultation with the defense independent medical examiner, Dr. Henry Eiserloh, in opining that Mr. Durr's "future treatment" will cost $1,630.00, which will cover the cost of a Functional Capacity Evaluation.  *See* Favaloro Report 10/18/19, Exhibit D, p. 2.

1

I.        **BACKGROUND**

On December 17, 2017, Mr. Durr was a passenger aboard the M/V *Hannah C* for the purpose of a personnel transfer to an oil and gas production facility in Vermillion Block 315A. REC/GOL are the owners and operators of the M/V *Hannah C*. The transfer of Mr. Durr from vessel to the platform was to be accomplished via a personnel basket tethered to a crane located on the platform. It thus was important for the M/V *Hannah C* to remain steady so that the crane's fast line could be maintained at a 180º angle. After Mr. Durr was in the basket on the deck of the vessel, however, the operator of the *Hannah C* failed to hold the vessel's position, the deckhand was not holding the tag line, and the crane operator failed to abort the lift. The *Hannah C* moved towards the platform, causing the personnel basket holding Mr. Durr to swing toward the bow and strike a chain holding cargo.

As a result of the accident, Mr. Durr sustained serious injuries to his lumbar spine and left knee. After seven months of conservative treatment that did not alleviate his back pain and condition, orthopedic spine surgeon Pierce Nunley, M.D., recommended and performed a microdiscectomy lumbar decompression at L4-L5, although he explained to Mr. Durr that a fusion may ultimately be needed. When the decompression still did not resolve the Plaintiff's condition and symptoms, Dr. Nunley prescribed and performed a lumbar interbody fusion at L2-L3 on February 11, 2019. Plaintiff is approaching MMI from that procedure.

With respect to his left knee, Dr. Michael Haynie recommended arthroscopic surgery in November 2018, again after nearly a year of conservative treatment. Although Plaintiff has not scheduled that surgery as he underwent surgery on his back in February 2019, he is still experiencing significant problems and pain with his knee and treating with Dr. Haynie, who has never changed his opinion that the Plaintiff is a surgical candidate.

Dr. Todd Cowen, Mr. Durr's life care planner, examined him on December 6, 2018 in conjunction with preparing the original life care plan (prior to the earlier trial date being continued). Dr. Cowen is a practicing physician who is Board-certified in Physical Medicine and Rehabilitation (Physiatry), and Pain Medicine, and who is a Certified Life Care Planner (CLCP), and a Certified Physician Life Care Planner (CPLCP). Mr. Durr's original and amended Life Care Plans (Exhibits A and B to REC/GOL's motion) and Dr. Cowen's Declaration, attached hereto as Exhibit A demonstrate that he (1) is a qualified expert in Life Care Planning, Physical Medicine and Rehabilitation, and Pain Medicine, (2) followed established, peer-reviewed standards of practice and methodologies in developing the Life Care Plan in this matter, (3) properly relied on his own medical expertise and experience in doing so, and (4) has consulted with one of the Plaintiff's treating physicians – Dr. Nunley.

Dr. Cowen has not yet been deposed, but his deposition is set January 9, 2020.

II.  **LAW AND ARGUMENT**

  A.  **Dr. Cowen is eminently qualified to give all of the opinions and recommendations in Mr. Durr's Life Care Plan.**

As set forth in his Declaration, Dr. Cowen is a Board-Certified Physical Medicine and Rehabilitation, and Pain Medicine specialist, licensed and practicing in Louisiana for over 24 years. He is a Certified Life Care Planner (CLCP), as designated by the International Commission on Health Care Certification, and a Certified Physician Life Care Planner (CPLCP), as designated by The Certified Physician Life Care Planner (CPLCP) Certification Board. In addition, Dr. Cowen is a Board Member of the American Academy of Physician Life Care Planners, and a Member of the Certified Physician Life Care Planner Certification Board, the governing body of the Certified Physician Life Care Planner (CPLCP) Certification. His professional career includes numerous medical directorships, and committee memberships. Currently, in addition to his private

medical practice, he serves as the Medical Director of the Spine Center of Excellence at Thibodaux Regional Medical Center.  Dr. Cowen is frequently invited to give presentations and speak at life care planning conferences.

According to one of the essential texts on the subject of life care planning, *Life Care Planning and Case Management Handbook*, Dr. Cowen's training and Board Certification in Physician Medicine and Rehabilitation places him in a superior position with respect to life care planning than some other types of physicians and non-physician life care planners.

> For a Life Care Plan to appropriately provide for all the needs of an individual, the plan must have a strong medical foundation.  ***Physicians specializing in physical medicine and rehabilitation (physiatrists) are uniquely qualified to provide a strong medical foundation for life care planning based on their training and experience in providing medical and rehabilitative services to individuals with disabilities***. Physiatrists are, by their training, experienced in dealing with individuals who have catastrophic functional problems.  Additionally, physiatrists are trained to anticipate the long term needs of their patients.

Bonfiglio, R.P. (2010), The Role of the Physiatrist in Life Care Planning, in R.0. Weed and D.E. Berens (eds.), *Life Care Planning and Case Management Handbook* (3rd ed.). Boca Raton, FL: CRC Press, Ex. A-5, at 19-20 (emphasis added)).

The American Academy of Physician Life Care Planners also recognizes and endorses the opinion that Physiatry (Physical Medicine and Rehabilitation) has "special relevancy and unique applicability to the discipline of life care planning":

> Physiatrists are experts in the medical and physical treatment of disabling illness and injury, and have long been recognized as uniquely qualified among medical specialists to provide the scientific and medical foundations essential to the development of life care plans.  Physiatrists, by the nature of their training, are holistic and comprehensive in their approach to the assessment of medical and rehabilitation requirements and are well suited to determine what medical conditions remain relevant to a subject's future care considerations.

Gonzales, J., and Zotovas, A., *Life Care Planning: A Natural Domain of Physiatry*, PM&R: The Journal of Injury Function And Rehabilitation, Vol. 6 (no. 2), at 184–187, Ex. A-7.  For these

4

reasons, the American Academy of Physician Life Care Planners advocates the practice of life care planning by board certified physiatrists. *See* American Academy of Physician Life Care Planners, *A Physician's Guide to Life Care Planning: Tenet, Methods, and Best Practices for Physician Life Care Planners*, (1st ed. 2017), Exhibit A-4, at 10 (hereafter "*Tenets, Methods and Best Practices*").

With respect to his experience as an expert witness, Dr. Cowen has testified in court (state and federal) at least 33 times since 2011 as an expert, the majority of times as an expert in life care planning. Ex. A-2. He has been retained and deposed as an expert hundreds of times. Ex. A-3. Dr. Cowen has never been denied expert status by a Court, and, to the best of his knowledge, has never had an opinion excluded based on an alleged defect in his methodology. Cowen Dec., Ex. A, ¶ 3.

**B.      Dr. Cowen employed a well-established and reliable methodology in this case.**

*1.      The standard for admissibility*

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Whether the testimony will assist the trier of fact is the key criterion established by that article. *See* La. Code Evid. art. 702. Under *Daubert*, this Court serves a "gatekeeping function" in determining whether to admit expert testimony at trial. *See Daubert v. Merrel Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). This gate-keeping obligation applies not only to "scientific" testimony, but to all expert testimony, whether based upon "scientific," "technical," or "other specialized" knowledge. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149-49 (1999). The trial court must "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. As set forth by Judge Africk in *Kennedy v. Magnolia Marine Transport Company*, 189 F. Supp. 3d 610, (E.D. La. 2016):

A number of nonexclusive factors may be relevant to the reliability inquiry, including: (1) whether the technique has been tested, (2) whether the technique has been subjected to peer review and publication, (3) the potential error rate, (4) the existence and maintenance of standards controlling the technique's operation, and (5) whether the technique is generally accepted in the relevant scientific community. *See Burleson v. Tex. Dep't of Criminal Justice*, 393 F.3d 577, 584 (5th Cir. 2004). The reliability inquiry is flexible, however, as "not every *Daubert* factor will be applicable in every situation; and a court has discretion to consider other factors it deems relevant." *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir.2004). "Both the determination of reliability itself and the factors taken into account are left to the discretion of the district court consistent with its gatekeeping function under [Rule] 702." *Munoz v. Orr*, 200 F.3d 291, 301 (5th Cir. 2000).

Importantly, questions relating to the factual bases and sources of an expert's opinion goes to the credibility and weight of the testimony, and not its admissibility. *See Carter v. Hornbeck Offshore Transp., LLC*, No. Civ. A. 12-1545, 2014 WL 2898458, *2 (E.D. La., June 26, 2014) (Duval, J.) (quoting *Tyler v. Union Oil Co. of Cal.*, 304 F.3d 379, 392-93 (5th Cir. 2002)). And, objections to the conclusions reached by an expert, rather than true objections to the methodology employed by the expert to reach those conclusions, are not a proper basis to exclude an expert under *Daubert* or Rule 702.

### 2. *Consultation with treating physicians may be helpful but is not required for the development of an accurate and reliable life care plan.*

#### a. *Snider* is not "well established" law.

REC/GOL asserts that it is well settled that a life care planner must rely on a treating physician's testimony for all items in a life care plan, citing *Snider v. New Hampshire Ins. Co.*, No. 14-2132, 2016 WL 3193473 (E.D. La., June 9, 2016) (Morgan, J.). But it does not appear that

6

the rule stated in *Snider* has been widely adopted by other sections in this district court, and it is not the established rule within the Fifth Circuit. To the contrary, courts within the Eastern District and other districts in the Fifth Circuit have consistently allowed a life care planning expert to testify regarding a plaintiff's future costs of care, even if the care has not been recommended by a treating physician, if the opinion testimony otherwise satisfies *Daubert* and Rule 702.

For instance, in *Alvarado v. Diamond Offshore Management Co.*, the court rejected similar challenges to a life care plan and concluded that the plaintiff's plan was sufficiently scientifically reliable under the *Daubert* standards. No. Civ. A. 11-25, 2011 WL 4948031, *4 (E.D. La., Oct. 18, 2011) (Fallon, J.). In that case, the defendants contended that the life care plan was too speculative due to its lengthy time frame (looking 37 years into the future), that some items relied on unsupported factual assumptions, and that the physician who prepared the plan was not the plaintiff's treating doctor and had only spent limited time with the plaintiff. *Id*. at *2, *4. The court denied the defendant's motion and held that such issues were to be determined by the finder of fact by stating:

> In general, these issues relate to the weight of the evidence rather than its admissibility. Both the testimony and the plan may be attacked on cross-examination without excluding the potentially persuasive portions of the plan that the jury may use to determine damages, if necessary. Thus, the life care plan and expert testimony concerning is admissible, and questions regarding their reliability will be determined by the finder of fact.

*Id*. at *4. *See also Rosiere v. Wood Towing, LLC,* No. Civ. A. 07–1265, 2009 WL 799698 (E.D. La., Mar. 23, 2009) (Berrigan, J.) (holding an expert could testify regarding the plaintiff's life care plan when he reviewed medical records and the pertinent medical findings of each treating physician).

Other courts within the Fifth Circuit have held similarly. In *Koenig v. Beekmans*, a district court in Texas specifically addressed specifically the issue raised by the defendants, namely that a

7

life care planner must consult with the patient's treating physicians or be a treating physician. No. Civ. A. 15-822, 2017 WL 7732809, at *3 (W. D. Tex., Mar. 23, 2017). The district court ruled that the doctor in that case who wrote the life care plan was qualified to testify about medical procedures he was not going to perform, noting that medical specialists are qualified to testify about other fields of medicine ancillary to their own. *Id*. at *2. The defendants also argued that the life care planner was unqualified to speak to the cost of future medical procedures not derived directly from treating physicians or other healthcare providers in the area. *Id*. at *3. The court again held that the bases of the expert's determinations on the amount of future medical expenses are an issue for the weight of the evidence, not its admissibility, and the jury should be allowed to decide how much in future medical expenses to award the plaintiff. *Id.*

Finally, in *Green v. Polyester Fibers, LLC*, a district court in Mississippi also specifically addressed whether an expert in life care planning must consult with a plaintiff's treating physicians or be a treating physician himself to render an opinion. No. Civ. A. 13-00234, 2015 WL 6158813, *2 (N.D. Miss., Oct. 20, 2015). The court held that a life care expert could testify as to a plaintiff's future care needs even though "there has been no testimony or record by any physician about [plaintiff's] future medical needs resulting from his spinal cord injury." *Id*. The court explained:

> it is standard within the industry to rely on a personal interview with the subject of the life care plan and a thorough review of the subject's medical records [in forming a life care plan]… [and] there is no requirement for a trained, experienced rehabilitation counselor to consult with treating physicians or independent medical doctors before formulating the life care plan.

*Id*. In rendering its decision, the court stated, "[i]n light of Dr. Burke's unquestioned qualifications, and the industry standards to which he avers, the Court finds a sufficient basis for Dr. Burke to testify concerning the life care plan" and any concerns could be raised "through impeachment and cross-examination." *Id*. *See also North v. Ford Motor Co*, 505 F. Supp. 2d 1113, 1119 (D. Utah 2007) (denying motion to exclude a life care plan developed by a nurse, explaining that the

challenges to the future medical costs, which were based on an alleged lack of professional information, "are a matter of credibility and weight to be brought out in cross-examination and resolved by the jury").

### b. Industry standards endorse physician life care planners.

A life care planner's reliance upon the opinions of treating physicians is addressed by the American Academy of Physician Life Care Planners, which draws a clear distinction between ***non-physician*** life care planners and physician life care planners (like Dr. Cowen), and highlights the need in some circumstances for ***non-physician*** life care planners to consult with treaters.

> The formulation of medical opinion is beyond the bounds of most life care planners' professional licensure. This lack of professional capacity presents ***non-physician*** life care planners with a material challenge that is succinctly described by Richard Paul Bonfiglio, MD, in the essential text, the Life Care Planning and Case Management Handbook: "The foundation of many life care plans is limited by the plan developer's experience and the frequently marginal input from treating physicians. Especially in developing a plan for an individual with complex health care needs due to a catastrophic injury or illness, the life care planner and the treating physicians may have very little experience in dealing with a person with similar medical issues." The challenge for ***non-physician*** life care planners is magnified by the practical reality that the treating physicians whom they rely on are often unavailable, unwilling, or unable to assist life care planners in the development of their plans' medical foundations. Many treating physicians do not have time to respond to requests for information, and if and when they do respond, they often afford limited time to meaningful consideration. In addition, and in many cases, treating physicians are unable to properly assess an individual's overall medical status and need at the time of a life care plan's production, which may be months or years since the last time they had contact with a patient. Lastly, treating physicians typically think of a patient's needs on visit-to-visit basis, and are unaccustomed to considering long-term care needs which can last over the course of years or decades.

*Tenets, Methods and Best Practices*, Ex. A-4, at 7 (emphasis added).

As discussed above and set forth in the literature, Dr. Cowen's training, skills, and experience as a licensed physician, and a physiatrist, provide him a unique advantage over non-physician life care planners, as he is in a position to render the medical opinions upon which the

Life Care Plan is premised. *Id.* at 9-10. *See also* Bonfiglio, The Role of the Physiatrist in Life Care Planning, Ex. A-5, at 19 ("Physicians specializing in physical medicine and rehabilitation (physiatrists) are uniquely qualified to provide a strong medical foundation for life care planning based on their training and experience in providing medical and rehabilitative services to individuals with disabilities.").[2]

Nevertheless, Dr. Cowen did consult with Dr. Pierce Nunley, the Plaintiff's treating surgeon. Cowen Dec., Ex. A, ¶ 9. In sum, Dr. Cowen is qualified to render the underlying medical opinions upon which the Plaintiff's Life Care Plan is based and also consulted with a treating physician. The Plaintiff's plan is also properly based on Dr. Cowen's interview and examination of the Plaintiff and the Plaintiff's medical records and history. There are no defects in Dr. Cowen's methodology that render any part of Mr. Durr's Life Care Plan inadmissible.

  **C.**  **Each of the challenged items in the Life Care Plan is supported by Mr. Durr's medical records, diagnoses, Dr. Cowen's consultation with Dr. Nunley, and Dr. Cowen's own examination and medical training, experience, and expertise.**

REC/GOL has not yet deposed Dr. Cowen to ask specific questions it may have about the bases for certain of the challenged items in Mr. Durr's Life Care Plan. Accordingly, Dr. Cowen's Declaration, in part, is being submitted to explain further the rationale and support for each of those items. Following is a summary of Dr. Cowen's Declaration as to each item.

  1. Arthroscopic knee surgery: On November 21, 2018, Dr. Haynie did recommend

---

[2] Moreover, treating physicians are accustomed to addressing patient issues in real-time, and only project short term needs on a visit-to-visit basis, rather than the universe of needs a patient will require throughout his entire probable duration of care—which is the antithesis of the manner in which future care is formulated when employing proper life care planning methodology. Furthermore, none of Mr. Durr's treating physicians are trained or certified in the field of life care planning.

arthroscopic surgery to repair Mr. Durr's posterior horn medial meniscus tear (Ex. B-007). Dr. Haynie noted again on July 16, 2019 that he had recommended the surgery although it had not been scheduled (Ex. B-008). Although Dr. Haynie noted on that date that surgery would not help Mr. Durr's patella femoral syndrome, *he did not say that surgery would not help his meniscus tear*. Mr. Durr's records indicate his meniscus is still symptomatic and likely will not improve without surgery (Ex. B, B-009-B-014). Based on Dr. Haynie's records, Mr. Durr's diagnosis, and Dr. Cowen's own training, experience, and expertise as a physiatrist treating patients with the same condition, Dr. Cowen's opinion is that the Plaintiff will require the surgery and other treatment and imaging included in the plan. Cowen Dec., Ex. A, ¶ 10.

   2. Mr. Durr's Lumbar Spine: Dr. Cowen consulted with Dr. Nunely about the Plaintiff's undergoing lumbar radiofrequency ablation ("RFA") procedures (as noted in the amended plan), and it is standard of care to perform at least one medial branch block before an RFA. Cowen Dec., Ex. A, ¶ 10. Moreover, Dr. Nunley recently recommended medial branch blocks at multiple levels of the Plaintiff's lumbar spine (Ex. C). As to Dr. Cowen's inclusion of a TENS unit and lumbar back brace in the Life Care Plan, these are extremely common and conservative items used to treat persons with chronic pain and based on Dr. Cowen's training, experience, and knowledge treating individuals with similar conditions and symptoms as Mr. Durr. Cowen Dec., Ex. A, ¶ 10.

   3. Essential Services and Home Health Aide: Dr. Cowen noted in the Life Care Plan that Mr. Durr lives alone. Based on Mr. Durr's lumbar and knee diagnoses and prognoses and Dr. Cowen's training, experience and knowledge treating individuals with similar conditions and symptoms, Dr. Cowen's opinion is that Mr. Durr will likely be unable to perform any heavy lawn or home maintenance care and will need limited home health aide in the future. As a Board-

certified physiatrist, Dr. Cowen is extensively trained and qualified to treat and render opinions regarding a person's physical restrictions and limitations and functional abilities, and he has written thousands of prescriptions for home health aide in the practice of medicine. Cowen Dec., Ex. A, ¶ 12. Moreover, the Life Care Plan includes very minimal and conservative recommendations for both of these items.

4. Annual comprehensive metabolic panel: Mr. Durr is currently taking and will continue taking medications that require lab monitoring pursuant to medical standards of care. Although some physicians would require such testing two times a year, Dr. Cowen has included the cost of having such testing performed only one time a year. This item is based on Dr. Cowen's extensive experience treating patients with similar conditions and on similar medications. Cowen Dec., Ex. A, ¶ 11.

5. Cost estimates of Mr. Durr's medications: When pricing out medications, it is essential for a life care planner to research the price for both brand name medications and generic medications. Dr. Cowen adheres to the published, peer-reviewed *Tenets, Methods and Best Practices* advocated by the American Academy of Physician Life Planners, which states:

> For a physician life care planner to make an assumption that a subject will be prescribed either brand name or generic medications in the future is to risk biasing a cost/vendor survey, and a cost analysis in one manner or another, something a physician life care planner should endeavor to avoid.
>
> Additionally, if a physician life care planner were to specify generic medications only, he or she would knowingly or unknowingly assume that no drug innovations will occur within a subject's probable duration of care, and in doing so, excludes the subject from access to their potential benefit.
>
> ***An appropriate way for a physician life care planner to avoid such bias is to source cost data for brand name, as well as generic versions of the same medication, and then use the average (arithmetic mean) of their respective values.***

*Tenets, Methods and Best Practices*, Ex. A-4, at 109 (emphasis added).

### III.   CONCLUSION

Dr. Cowen's Life Care Plan, amended plan, and Declaration establish his qualifications and methodology, which is reliable under La. Code Evid. art. 702 and *Daubert*.  To the extent REC/GOL still challenges the propriety of including any particular items in the plan, it will have the opportunity to depose Dr. Cowen in January and can cross-examine him at trial regarding the factual bases for the specific items and amounts.  There is absolutely no reason for the Court to exclude any part of the plan at trial though.

    Respectfully submitted,

WILLIAM GEE, LTD.
(A PROFESSIONAL LAW CORPORATION)
WILLIAM GEE
Louisiana State Bar No. 14282
PINHOOK TOWER
2014 West Pinhook Road, Suite 501
Lafayette, LA 70508
Telephone: (337) 222-2222
Facsimile: (337) 289-0809
William@WilliamGee.com

And

JENNIFER L. THORNTON (La. Bar. No. 27109)
ENDYA L. HASH (La. Bar. No. 38260)
STANLEY, REUTER, ROSS, THORNTON &
    ALFORD, LLC
909 Poydras Street, Suite 2500
New Orleans, LA 70112
Telephone: (504) 523-1580
Facsimile: (504) 524-0069
jlt@stanleyreuter.com
elh@stanleyreuter.com

By:  */s/ Jennifer Thornton*

*Attorneys for Plaintiff*

13

## **CERTIFICATE OF SERVICE**

I hereby certify that, on this 13th day of November, 2019, the foregoing pleading was filed electronically in the lead consolidated case using the Court's CM/ECF system and this pleading was thereby served on all counsel of record.

                                                   */s/ Jennifer Thornton*